Mr. Braga? Yes. Good morning, Your Honor. Thank you. As director of the Appellate Litigation Clinic at the University of Virginia School of Law, it's my pleasure to introduce to the Court this morning two third-year law students, Aisha Penn and Marie Hanna-Winkle, who satisfy the requirements for practice before this Court and who have our client's consent to argue this appeal this morning. Thank you, Professor. You're welcome. Students? Ms. Penn? Thank you, Mr. Chief Judge, and may it please the Court. My name is Alicia Penn, and I represent the petitioner today, Mr. Jimmy Haynes. Here, we have a minority pro se litigant who just did not get a fair shake. At his job with Waste Connections, there were several instances of this. Mr. Haynes not getting a day off when his wife had a miscarriage. Instances of the company failing to assign a swing driver when he did take days off. And lastly, his supervisor, Mr. Fountain, repeatedly saying that Mr. Haynes was not one of his favorites or not one of his chosen ones. And then, in our very own justice system, Mr. Haynes did not get a fair shake. The judge denied Mr. Haynes his day in court in front of a jury, even though he has put forth enough evidence regarding his prima facie case to survive summary judgment. The question before this Court today is not whether Mr. Haynes is entitled to win on his employment discrimination claim. The question here today is whether Mr. Haynes established his prima facie case sufficient to survive summary judgment, which he did. The district court erred when it found that Plano failed to establish a prima facie case of discrimination and granted summary judgment. What's your best evidence of a prima facie case of racial discrimination? We do not need direct evidence of racial discrimination. We don't need a supervisor. Yeah, but what is your best evidence at the summary judgment stage at this point? Our best evidence are waste connection shifting reasons that, as this Court has stated, is evident pretext. We have at least six instances of waste connections changing their reason, and the initial reason was false. In Mr. Haynes' termination meeting that occurred on October 8th, 2015, Mr. Fountain and upper-level management said Mr. Haynes was fired due to job abandonment. And when Mr. Haynes asked, when did this happen, they said, the policy has been in place since before you were hired. They explicitly referenced the policy. Heather, didn't they also tell him in that meeting, what we mean by that is that you showed up and left? I'm not sure, Your Honor, but they said that they referenced the policy, which was false under their policy. I have to say this seems, I don't want to be critical, but a little bit nitpicky. I mean, I thought they were pretty clear in that meeting, we're firing you because you showed up for work and then you left without telling anyone. Yes, Your Honor, they did say that. I'm not exactly what label you put on it. I'm not sure that that sort of falls within ARC's law in shifting explanations. No, Your Honor, except for that they explicitly referenced the policy. They met with John Morgan, the HR representative at Waste Connections, who should know the policies. And the policy explicitly says, as shown on the supplemental appendix, page 21, that job abandonment is no-call, no-show for three consecutive days. And I would like to note that that policy also says that exceptions may be made in emergency situations. And Mr. Haynes did provide notice. He texted his supervisor, Mr. Pound. I thought, don't they have a policy that says, the other policy, that says no texting, like you actually have to talk to someone when you're walking off the job, which is pretty common? Yes, Your Honor. However, this was their normal mode of communication was texting, as Mr. Haynes has testified to in his affidavit. Well, I don't get it. If you're walking off the job at midnight and you text someone, I mean, what are the odds they're going to get the text? Your Honor, I cannot testify as to the odds. It just seems like a sensible rule that you actually have to speak to someone if you want to do that. Yes, Your Honor, but it was not walking off the job. He was taking a mere sick day. Well, but he showed up at the job and then left, and he didn't tell anyone. Yes, Your Honor, he did leave, but he told Mr. Fountain it in their normal mode of communication. Okay. We ask that this court reverse the district court's grant of summary judgment and remand for trial for three reasons. First, Mr. Haynes has sufficiently established his prima facie case by demonstrating he was performing satisfactorily and that there was at least one white employee who was similarly situated who received better treatment. Second, Mr. Haynes has sufficiently established that defendant's stated reasons were pretext. And lastly, the district court failed to even consider Mr. Haynes' alternative argument regarding whether race was a motivating factor in Waste Connection's termination decision. The district court's grant of summary judgment was in error. Summary judgment is only appropriate when there is no genuine dispute as to any material fact, meaning no reasonable fact finder could find for Mr. Haynes. The facts in all reasonable inferences must be viewed in the light most favorable to Mr. Haynes. The court may not weigh evidence or make determinations about credibility. Additionally, a court cannot resolve disputed facts at the summary judgment stage. Yet, this is precisely what the district court did. Mr. Haynes sufficiently established that he was performing satisfactorily. And this is where the timeline matters, Your Honors. Waste Connections would like to argue that these incidents that happened prior to October 7th were why they fired Mr. Haynes. Yet, Mr. Haynes specifically scheduled a meeting with Mr. Found to discuss his upcoming annual performance review. This court has showed and can you talk to me about why Mr. Hicks, I think it is, is an appropriate comparator for Mr. Haynes? Yes, Your Honor. Joseph Hicks is a valid comparator because the standard here is not that Mr. Haynes was performing as a model employee or employee of the year. He has to be performing at the lowest acceptable standard. And that's what he did. Mr. Hicks, and we are looking at two incidents here that are not disputed, the cell phone incident and Mr. Haynes, quote, unquote, walking off the job as Waste Connections would characterize it. And those two incidents are exactly what Mr. Hicks did, and he was worse. First, Mr. Haynes used his cell phone in an effective and safe manner when he just simply touched his cell phone to check the time while at a stoplight, which he believed he was able to do, whereas Mr. Hicks was talking on his cell phone at least on two separate occasions. And under Mr. Fountain's own standard of safety and saying that this could be catastrophic and, you know, if we don't follow our safety standards, it could lead to a death, Mr. Hicks was talking on the phone while he was operating a multi-ton truck on two separate instances. Yet he did not get a day suspension. He just got a slap on the wrist and a written notice. Then Mr. Haynes, when he, quote, unquote, walked off the job, when he took his sick day, he texted his supervisor in a respectful and in their normal mode of communication. He said, Good morning, Jim. I have come down with a stomach virus. If you have any questions, let me know. Let's contrast that with Mr. Hicks. Mr. Hicks received a call from his supervisor after the start of his shift, and he started yelling at Mr. Fountain, the same supervisor as Mr. Haynes. He was combative, assertive, and he walked off the job. He brought his truck back, and he left his things in there, and he walked off. And these are their own records, correct, describing Mr. Hicks' behavior, correct? Yes, Your Honor. Combative? What's the other one? Combative, assertive. He was yelling at Mr. Fountain. But that wasn't abandonment. Right. Go ahead. Go ahead. I just want to make sure. Neither were abandonment according to their own policy, Your Honor. Right. And Mr. Hicks, if we look at the situation that Mr. Hicks left Mr. Fountain in, it's the same situation. It's actually worse. He started his shift and left him in the lurch, so to say, without any replacement. He had to scramble to find a replacement. Their records do not show whether they were able to find a replacement or not. Well, from the company's perspective, though, right, what they will say is at least they knew he left, so they were able to get a replacement, and there's no evidence that his route was unserviced, whereas with your client, they didn't know he left, and there is evidence that his route was unserviced. Does that count? No, Your Honor, because we don't have evidence that his route was serviced or not serviced. That's another fact that could be developed on remand. But that may not be true, correct? I'm sorry? The point is that might not be true, even though that's an assertion. Correct. Correct. And it's the same situation. Mr. Fountain has testified that his issue with it was that, you know, customers could have been unserviced, and, in fact, they were, but that's the same situation that Mr. Hicks left them in. And yet when he called back asking for his job again, he was back on the job within 48 hours. And yet Mr. Haynes was still working. The same employee who was combative? Yes, Your Honor. 48 hours. 48 hours. If we look at the supplemental appendix on pages 104 and 105, this is, actually, yes, that's Mr. Hicks' disciplinary notice, and it shows you the timeline. It says on this date he called and yelled at Mr. Fountain, and then it says the date that he was allowed to return to work. And it's less than 48 hours. And the differences between these two employees is Mr. Hicks was white and Mr. Haynes is black. Well, also, what the company will say is that one of them told them he was leaving the job and the other one didn't, right? I mean, for them, that's a pretty big deal. Sure, Your Honor. That's what they will argue. But Mr. Haynes provided notice. And that's true, right? No, Your Honor. Well, it is true that one of them talked to his supervisor and the other one didn't, and that their policy actually says no text messaging. If you want to walk off the job, you need to speak to someone. Text messages are not enough. So one of them violated that policy and one of them didn't. And I know it seems sort of like hair splitting, but I have to say, just as a practical matter, I mean, people, I guess, can have different intuitions about this, but an employee who gets angry because there's a fight with a customer and the employer isn't taking his side and sort of stomps off the job and comes back, versus an employee who walks off the job without telling anyone, and then the employer does have at least reason to believe he's not being truthful about the reason he left. I mean, I could actually imagine treating those two situations differently. Yes, Your Honor. And I'm glad you brought up that the company is asserting that they now believe Mr. Haynes was lying. But, and this goes to our pretext argument about the shifting reasons, there is a recording of Mr. Haynes' termination meeting that was submitted in the lower court, docket number 95. And in that termination meeting, they did not once mention their belief that Mr. Haynes was lying. The only thing they mentioned was job abandonment, and they explicitly referenced the policy, which was false. And that's a disputed fact, whether he was lying or not, that's a credibility determination for the jury to make. Yes, Your Honor, and that is a determination that should be made by a fact finder, not this court or the lower court at summary judgment. Mr. Haynes was performing satisfactorily. This Court has said, and King v. Rumsfeld, that the plaintiff can show that he was performing satisfactorily by submitting annual performance review. Unfortunately, we do not have those in this case, because when Mr. Haynes asked for his performance review right before the start of this case, Waste Connections stated their general practice was to not release past performance reviews unless it was requested by a government agency or a court order. Then, when we did have this case in the district court, they did not fully comply with discovery, as noted in Mr. Haynes' motion to compel, that he didn't, he still did not have his annual performance review. So this key piece of evidence is missing. However, Mr. Haynes does have evidence from his scheduled, planned meeting with Mr. Fountain to discuss his upcoming annual performance review, not an offhand comment, not a nicety. Mr. Fountain chose to say in that meeting, everything looks good and you have nothing to worry about. Those are not comments from a supervisor that believes in good faith that his employee is one minor infraction away from being terminated. And again, Mr. Fountain, I mean, Mr. Haynes does not need to be Employee of the Year or even Employee of the Month. He just has to perform to the lowest acceptable standard. And that's what we have here. And lastly, our pretext argument. Fourth Circuit case law in EEOC v. Sears Roebuck and also Wesley v. Arlington County states that an employer shifting or inconsistent reasons over time is evidence of pretext. We have at least six instances of Waste Connections changing their reason as to why they terminated Mr. Haynes. First, in the meeting, they claimed job abandonment according to the policy, which we have discussed why that was false. Then, in its briefing, it says, no, it wasn't job abandonment according to the policy. It was just job abandonment generally. But how is an employee supposed to know that when an employee has a handbook explicitly laying out the company's explicit policies? Then, yet again, Haynes' discharge papers list violation of rules, another point of evidence saying that it should be the written policy. Yet the written policy says three instances, consecutive days of no call, no show. There's another policy, right? The punctuality and attendance policy? So if he violates that, how is that not a violation of the rules? Sure, Your Honor. It might have been a violation of the rules, but if my memory serves me right. Well, that's what they checked on the box. I guess, apart from the sort of the label, has the substance of the explanation shifted in a way that troubles you? Yes, Your Honor. Okay, let's talk about that. In its briefing before this very court, two brand new reasons popped up. First, their belief that Mr. Haynes was lying. And second, Mr. Haynes' quote, unquote, uniquely dismissive attitude. Yet, again, that was not mentioned at all in the termination meeting. Waste Connections and all of its employee meeting notices. You mean his attitude was relevant for him? Right, but not for Mr. Hicks. For Mr. Hicks. Correct, Your Honor. I'm also confused about that point. Yeah, it sounds strange. Go ahead. But also, their employee meeting notices, which Mr. Haynes had a few as well as Mr. Hicks, they have a section titled, Expectations for Corrections of Deficiency.  None of these mention Mr. Haynes' attitude. Not one of them. They all mention how to correct his behavior, which he did. Then, the lying, again, was not mentioned in the termination meeting. So, maybe the first three reasons might be consistent with each other. Absenteeism, job abandonment, according to the policy, even though that's false, job abandonment generally. Sure, we can say those are somewhat consistent with each other. But lying and a uniquely dismissive attitude is not consistent with their first stated reason, which was false. And this is evidence of pretext. So, Mr. Haynes has sufficiently established his prima facie case, sufficient to survive summary judgment. And that's all we're asking for here, Your Honors. We're not saying Mr. Haynes is entitled to win. We're just saying that these issues should be decided by a fact finder. And for those reasons, we ask that you reverse and remand to the district court so that Mr. Haynes may have his day in court. Thank you, Ms. Penn. Mr. Peterson. Morning. Morning. Judge Thacker, you led off with asking counsel what her best evidence of race discrimination was. She led her argument by saying three things that she said constitute evidence of race discrimination. None of them do. She said that Haynes was asked to ask for a day off and he wasn't giving it to him. There's no evidence whatsoever that that denial was because of race or that similarly situated white individuals were asked for days off and got them. Counsel then said, well, he was a swing driver and sometimes when he was absent, his route wasn't taken care of. Again, there's not a shred of evidence of comparators that white drivers didn't have their routes or had their routes picked up when they were absent. She then finally said that Mr. Fountain said repeatedly, a record some 20,000 to 50,000 times, that Mr. Haynes wasn't one of his favorites. The record shows, however, that Mr. Fountain, when I asked Mr. Haynes, when Mr. Fountain said, why aren't you my favorite? Mr. Fountain says, because you don't do what I asked you to do. So there is zero. Well, Mr. Hicks didn't do what he was asked to do either and had a pretty bad attitude about it. With all due respect, Your Honor, I disagree. Well, the record doesn't disagree. It says that he was ranting and not speaking in a civil tone, very upset, and that his behavior would need to drastically change. None of that is insubordinate. None of that is lying. Your Honor, you did make a comment earlier that you said it is a credibility determination as to whether, in fact, Mr. Hicks was lying. With all due respect, I disagree. It is not a credibility determination as to whether he was lying. The record evidence is clear that management believed that he was lying. Management predicated that belief upon interviews of people they talked to. And he says he wasn't lying, and at least with regard to his illness, his wife corroborated that. So why isn't that a credibility determination? Under Fourth Circuit precedent, Your Honor, the issue in summary judgment is not whether someone did or did not, in fact, do or do not a certain alleged act. Rather, the standard is, did management, when it disciplined, when it took action, did it in good faith believe that the conduct had or had not occurred? We're supposed to take all the allegations in Mr. Haines' favor at this point. Again, I might quibble with that articulation just to figure out. Well, you could. But what does it mean to have a uniquely dismissive attitude? What does it mean to Mr. Fountain to have a uniquely dismissive attitude? I'm not sure that Mr. Fountain, well, the evidence is that Mr. Fountain, when he disciplined Mr. Haines, the evidence is that Mr. Haines said, I'm not even going to assign the discipline. When I asked Mr. Haines, did he think he ever did something wrong, Mr. Haines said, no, I don't think I did anything wrong, even though I took a 50 to 60-ton truck and missed the turn. Not only did I miss the turn in my truck, I went off the side of the road. Counsel tries to say that that's not really a big issue for two reasons, one of which they abandon now in oral argument. But the first time they said, well, Mr. Fountain said that that wasn't a big deal. It wasn't that bad. In fact, what Mr. Fountain said was that when he got to the scene and he saw the truck, it wasn't stuck that bad. What do you do with Mr. Fountain telling Haines in September 2013, was it? Well, you're fine as far as your performance review goes. I mean, it certainly seems like he didn't think it was a very big deal. Thank you, Your Honor. You made a comment when you were asking questions earlier. You asked whether that, I'm sorry, your comment was about the inconsistent, alleged inconsistency with the job abandonment.  I'm sorry, Your Honor. My question is, if Fountain thought it was such a big deal, why did he tell Haines in September 2013 that he had nothing to worry about when it came to his performance review, everything looked good? Thank you. First of all, there was no performance review. The record is clear from Mr. Haines' own testimony that it was an upcoming conversation about his review. He said good things about his performance in September 2013. He did indeed. Can you just respond to that? But you had made a comment when you were questioning counsel. You said, is that consistent with our case law? The case law that Mr. Haines cited shows this. In the two cases they cited, there were performance evaluations. In one case, there were multiple performance evaluations. I'm just asking you kind of like a factual question. If it was such a big deal, if these other prior problems were such a big deal, what's your explanation, just factually, as a matter of common sense? What's going on here? Why did Fountain say everything looks good, your performance is good? Well, Your Honor, what I can say is this. I mean, I sort of thought your answer would be everything changed on October 7th, but apparently not. So why don't you fill me in on what's going on here? Two things. One, Mr. Fountain did not say in September, I wipe out all your prior conduct. And as this case has said in Diamond v. Bomar, in a very similar situation where a supervisor said, hey, your conduct is pretty good, this court said that that errant comment by in and of itself did not create pretext. This court also said, to your point, Your Honor, evidence of past acceptable performance is not the equivalent of good acceptable performance at the time of the last event. This court stressed that you need to look at the level of acceptability performance as of the last event. Although my opponent wrote in their brief that Mr. Fountain's comments were contemporaneous, they were not. What happened was you had significant, clear violations of policy, running a truck off the road, accessing a cell phone with discipline. That happened at the end of August. Then the alleged comment about the upcoming performance evaluations, don't worry, you've got nothing to worry about. Noticeably, Mr. Fountain did not say. The slate is now clean, Mr. Haynes. You have nothing to worry about. So unlike the cases where actual written performance reviews, and in both the cases cited also, neither of those plaintiffs had any prior discipline whatsoever. So if it wasn't tabula rasa for Mr. Haynes, and it certainly wasn't for Mr. Hicks either then, what about talking on the cell phone versus while you stop touching it to check the time? How do you compare those in terms of egregiousness? I'd say two things, Your Honor. First of all, the focus in this case. The focus is my question right now. How do I distinguish that? How would you compare those? Because you listed it. That's the reason why I'm wondering, because you brought it up again about the telephone, cell phone. How do you compare while you stop touching it to find out what time it is versus while you're driving, talking on the phone? I'm just wondering, since you've been very dramatic in terms of the way you presented the evidence. So tell us how you've come to that conclusion in terms of just the weighing. I think the policy does not allow any access of the cell phone, whether it is touching or talking. So they're equal to what you're saying? They're equal. That is what the policy says, Your Honor. And, indeed, the policy says— So just like the policy says you shouldn't be in an accident, so if someone nicks a fender or somebody comes by versus someone else drove one off a cliff, the policy says no accidents, but they're the same then, right? Oh, no. Why not? The policy says no accident. I'm just—I'm using your theory. Your Honor, as this court held in—and I'm going to butcher the pronunciation of the case—but Tshibaka versus Sunilaka back in 2016, this court said you have to carefully weigh and distinguish not only violations in and among themselves, but the level of violations, the seriousness of violations, and determine— That's exactly what my question was to you. And I'm giving you, their counsel, a chance to explain it. You—absolutely, I agree with you completely. Your Honor, the record evidence—there is no record evidence parsing the level of seriousness between driving a 50-, 60-ton unit off the road as opposed to a minor fender. What about driving a how-many-ton unit while you're talking on the cell phone? Clearly a problem, Your Honor. You don't—nobody does that. Clearly a problem, Your Honor. And the record has evidence back in, I believe, 2013 or 2014 where Mr. Haynes was—this is prior to August of 2015. I'm talking about Mr. Hicks. He's the one that was talking on the cell phone while driving that however many tons— Depends whether it's loaded or not. Okay. Unloaded. Tear weight versus gross weight. Okay, all right. I would—well— That's exactly what the problem is—the whole case about the comparatives. Like, okay, he did the same thing, but one was on Tuesday and one was on Wednesday. Your Honor— Mr. Hicks did the same thing in two instances, but in my view worse. Talking on the phone while driving that vehicle is far worse than touching the phone to check the time while the vehicle stopped. And Mr. Haynes texting to let them know he was not going to be on the job and telling the mechanics when he got back there because he was sick is far different than Mr. Hicks' dismissive, ranting, carrying on attitude at his supervisor. I would say that's subordinate if somebody was yelling at me and I was their supervisor. So the comparison—why is that not—why is Mr. Hicks not a valid comparator? He is not a valid comparator because, as this Court recognized 30 years ago in Moore v. City of Charlotte, you have to carefully look at each incident. Who does? The fact finder? No. Yes. Okay, then. Done. No, no. I'm sorry. The fact finder. The judge, when he's ruling on summary judgment, has to look and see whether the incidents are the same or not, whether they are substantially—excuse me, not substantially the same. Judge Harris had asked the question once. Well, how are they not? Tell me how they're not the same. The folks accessing the cell phone, talking or touching, Your Honor, both are taking your eyes off the road. Both are being distracted. So they're the same. They are both in seriousness, absolutely. But Mr. Hicks and Mr. Haynes were both disciplined for their cell phone use. It is also in the record that Mr. Haynes had a prior cell phone incident. He also had a prior drive-cam incident where he ran through a red light. He was not terminated for those— Mr. Hicks said more than one incident, didn't he? He did indeed, Your Honor, and we should look at the similarity or lack of similarity of those instances. First of all, Mr. Haynes alone, as he admitted, walked off the job because he did not want to wait for five minutes. He has admitted that he did it, and he admitted that he alone has done it, and he admitted that that is deserving of some discipline. Mr. Hicks did not walk off the job. Mr. Hicks talked to— Since he quit. He did quit. But as the Seventh Circuit recognized— So since he was already off the job when he quit, yeah, technically he didn't walk off, but he quit. It is not just a technicality, I would suggest, Your Honor. It is a distinction of merit. As the Seventh Circuit said— What about the shifting explanations by the employer? What are we to do with that? I'm sure you say they're not shifting. I don't believe there is shifting explanations. As Judge Harris noted, she asked, well, wait a minute, wasn't there some other policy which he violated, which Mr. Haynes violated? Indeed, Mr. Haynes violated a policy, the punctuality and attendance policy, in many ways. So why was he terminated? Why was he terminated? He was told in a minute-and-a-half conversation, twice, he was told, why am I being terminated? Job abandonment. What does that mean? He was asked twice. And the terminating supervisor said, it is because you came into work and you left. The articulated reason when we were challenged in court, we gave a full and complete explanation, including violation of policy. Attendance policy is not just, as counsel would have you believe, well, if you miss some days, you violated the policy, and I didn't miss any days. Rather, the policy says, it is a violation of this policy— And when did this uniquely dismissive attitude come into play? When did it come into play? Thank you for asking, Your Honor. There's a little artifice going on here. Counsel argued, wait a minute, if he really had a dismissive attitude, he worked there nine years, why wasn't he ever disciplined for it beforehand? The answer is, as the record ever established, he didn't have the dismissive attitude until he was disciplined. He was first disciplined in August. When did the employer raise this uniquely dismissive attitude point? When he was asked to articulate a nondiscriminatory legitimate reason before the district court. At that point, when the law requires the employer to articulate the nondiscriminatory legitimate reason for termination— But you had the nondiscriminatory—I thought it was abandonment. Your Honor, it— Then you added uniquely dismissive attitude and liar? Yes. There is no requirement, Your Honor. There's no legal requirement nor inference of discrimination. I think Mr. Hicks had a uniquely dismissive attitude, and he might be a liar for all I know. He might be a liar for all you know, but I would say on summary judgment, that's the point. There is no evidence of that. That's exactly right, that's the point. There is no evidence that Mr. Hicks lied. There is evidence that management believed in good faith without contradiction and after having done an analysis— Wait, without contradiction? He says he didn't lie. And his wife says he didn't lie. Again, Your Honor, I respectfully submit that the legal standard is not whether the plaintiff, terminated employee, believed he committed a wrongful action. That might be right, but then don't say without contradiction, because it is contradicted. I mean, the legal standard may be, as you say, that what matters is whether the employer reasonably believed it to be so. But it is not uncontradicted. So you should just be careful in the way you talk about it. Thank you, Your Honor. So the lie is that he really wasn't ill, is that what you're saying? Yes. That's what management believed. So you're saying that you conclude that his wife was lying, too? Mr. Fountain didn't interview the wife. The wife's testimony— I said you concluded that his wife must have been lying, too. Whether I believe— No, not you. You were in there. You're the counsel now. Right. That's my point. Mr. Fountain didn't know the wife was even involved in that point. When Mr. Fountain made the statement— But didn't the wife corroborate that he was ill? Didn't she? In the litigation, she corroborated that. But in the actual moment, the event we are analyzing— But it was in the litigation when you brought up that he was a liar. You came up with that during the litigation. You just said that a minute ago. And, Your Honor, the employer is obligated to articulate its non-legitimate reason. And I wish it would. The non-discriminatory legitimate reason for termination is, as Mr. Fountain, Mr. Sirisa, and Mr. Morgan testified, that they had evidence that Mr. Haynes came to work, was upset that he had to wait five minutes, left. He didn't call as a punctuality and attendance policy required. He texted in violation of the policy. And in violation of the policy, the employer believed that he had lied. So he had violated the punctuality and attendance policy. Can I ask you a question about the policy? So, I mean, I get it that you require texting rather than calling. I did that with my students when I taught. If you want an extension, you have to talk to me about it. Don't tell me you texted me. But there is an allegation, right, that texting was the normal way that these two people communicated? There is one assertion by Mr. Haynes himself. Because that seems relevant. Like, if in fact that's written down in the policy, but it's not really enforced, that usually texting is fine. That seems like that might be something that might go to a jury. It is relevant, but I would say not important or legally significant because there is no evidence that texting was ever done when Mr. Haynes was calling in sick. That's the key, as you pointed out earlier, Your Honor. The reason you want employees to call supervisors, make contact, is so that the shifts are covered. Although Mr. Haynes has one sentence where he said, that's how I used to communicate with Mr. Fountain. Again, no evidence ever that he did that to announce an absence. And, Your Honor, you talked about comparators. There is no evidence that when Mr. Hicks quit, after he talked to his supervisor, that any shift was left undone. There's no evidence that any customers were left unserved, and there's certainly no evidence that when Mr. Hicks talked to Mr. Fountain, he was deceptive in any way. So you have 15 seconds. If there's any other questions, I'm happy to answer. Thank you. Thank you, counsel. Ms. Haines, is it? Yes. Thank you. Your Honors, a few points of rebuttal. First, opposing counsel has stated that because Mr. Haynes did not follow the policy when he took this sick day, that he was entitled to termination. However, there are several reasons that this is false. First, the policy, both where it says job abandonment and where it says punctuality and attendance, refer to three days, three consecutive days of no call and no show, whereas Mr. Haines simply took one singular sick day. So even according to that punctuality and attendance policy, he wasn't violating the policy at all. So the policy doesn't say that if you want to leave your shift, you have to let someone know? The policy does say that you have to let someone know. And that is why 45 minutes before his shift started, Mr. Haines texted his supervisor. But it also says you can't text, right? Yes, Your Honor. However, Mr. Fountain has specifically testified that that's how he talked to his supervisor. I'm very interested in this. Is there anything in the record suggesting that he used texts to leave the job or take a sick day before? Your Honor, there's evidence that this is the normal way in which he communicated with his employer. Okay, but nothing specific? In all circumstances is what he testified to. But in all circumstances, he would text his employer. Additionally, this same policy says that exceptions may be made for unforeseeable emergencies. I would say that a sudden stomach virus would be an unforeseeable emergency, and therefore you would be able to have this exception of him texting 45 minutes before. I can't imagine that getting sick is the unforeseeable emergency. I mean, the whole point of the policy is what to do when you get sick. Well, Your Honor, there are different types of sicknesses, and this one is the type that a stomach virus can come on very suddenly. He can show up to work and feel fine one moment and then not feel fine the next. Right, so you're supposed to call your supervisor before. I mean, you can't run a workplace where if people get a stomach virus, they don't have to tell you that they're leaving. Surely they're contemplating a more serious emergency than a stomach virus. Maybe they are, Your Honor, but the point here is that he did text his employer, which was his normal way of communication. In any other circumstance in which Mr. Haynes had to speak with Mr. Fountain, he would text Mr. Fountain and let him know, and that would be enough. If he was never written up for texting before, that was never a problem in the past. It seems to have only been a problem in this singular incident, which is why this certainly should not have been enough for Mr. Haynes to be terminated. Second of all, I'd like to look to the pretext argument. Opposing counsel has specifically stated that they brought up Mr. Haynes' uniquely dismissive attitude before the district court when they were asked for a reason. This, in and of itself, is evidence of pretext. This court has specifically stated in Roe v. Marley that evidence of pretext is enough to show racial discrimination, and this is a post hoc change in reasoning for Mr. Haynes' termination. They specifically said this was never mentioned until we got to the district court and were asked for a reason. It wasn't mentioned in the termination meeting, which we have a recording of. It wasn't mentioned in Mr. Haynes' termination paperwork. It was never mentioned in any of his write-ups, and it wasn't mentioned in his performance review. Let me put what I think is sort of their best spin on this pretext issue and get your response. So I think what they would say, what they should say, is, look, he got fired because of the thing on October 7th. That's why we fired him, and they have been consistent about that. That thing he did on October 7th is why he got fired. When we got to the district court, we also explained why we were kind of tough on him. We had the right to fire him on October 7th, but the reason we sort of threw the book at him was because we also considered this other stuff. And we have a bunch of cases saying that when you provide context or amplification of why you enforced a disciplinary rule the way you did, that's not a shifting explanation. That's providing context. But as long as you've been consistent, the person got fired because of what they did on October 7th. That's not the kind of shift we're worried about. Can you respond to that? Because I think that's sort of their best argument. Yes, Your Honor. So in this case law, the reasons that they used to amplify were supported by the record. For example, many of these employees had past performance reviews where they were told, if you don't change your attitude, you will be looking at termination in the future. However, Mr. Haynes simply had one, or he had his performance reviewed two weeks prior where he was told everything looks good. His attitude was never mentioned. His attitude was never mentioned after any of his incidents. It wasn't in the write-ups. There's no evidence that while Mr. Haynes was employed that Waste Connections had a problem with his attitude. There's no evidence in the record except for this argument that they suddenly brought to the district court. Well, also, and he keeps saying – I'm sorry. Mr. Haynes says that his supervisor keeps telling him, you're not my favorite because you won't do what I tell you to do. So there's that in terms of an attitude problem. Your Honor, that did not speak to his attitude. That spoke to – Well, if you constantly – I mean, according to your own client, this guy keeps telling me I don't like you and the reason is you won't do what I tell you to do. I see my time has expired, Mr. Chief Judge. You may answer. Thank you. Yes, this could potentially be evidence of this, but this was never stated in the record. You would think that if they – But your client testified to it in the record. Right, that was stated in the record. But if they were referring to his attitude there, they would have told him in his performance reviews, everything looks good, but you should work on your attitude because we've seen this as a problem. Thank you. If there are no further questions, we ask that this court remand. Thank you so much. I note that, Professor and students, you were court-signed, and thank you so much for your work. At the Fourth Circuit, we depend upon those lawyers and students who take court assignments. We couldn't do our work without it, and I appreciate it very much, and I might say that the cavaliers were well heard from today. And thank you, Ms. Peterson, for representing your client. We'll come down and greet counsel and move to the next case.
judges: Roger L. Gregory, Stephanie D. Thacker, Pamela A. Harris